information if you're wondering why the third chair is vacant here, Judge Plager is going to join us remotely. And then you should also know that at the conclusion of this argument we'll take a recess and the panel will be reconstituted. So do we have Judge Plager here? You do, sir. Can you hear me all right? Yes, we can. Thank you. I hear you fine. Thank you, Your Honor. Good morning. May it please the court. My name is Glenn Boudreaux. I'm assisted by Crystal Parker this morning. We're both from the Houston office of Jackson Walker representing the transunion companies. As the court knows this . . . Excuse me, Mr. Boudreaux, please try to speak up well because there is a transmission issue. Yeah, I'm sorry. Is this better, Judge Plager? Much better, thank you. Okay. As the court knows, this is an appeal from the granting of a stay in the Minnesota District Court in favor of a TAB proceeding that was . . . the stay being granted shortly before the Markman hearing or claims construction hearing was to be heard at a time when all discovery was complete in the case. Mr. Boudreaux, on page 10 of Search America's brief, it says that transunion didn't disclose known key witnesses to the PTO during prosecution or to SA during litigation, which was the basis for filing the petitions in July 2013 instead of an earlier date. Is it true that transunion didn't disclose known key witnesses? Absolutely not, Your Honor. I can only surmise what Search America might have been reaching for when they made that claim in their papers. They found a gentleman by the name of Kirby Spruill who was retired from the Texas Health and Human Services Department and whom they claimed had developed a process if not exactly like transunions, then very close according to their claim. And that is part of the quote prior art that they apparently presented to the PTAB. We didn't know Mr. Spruill. My client didn't know Mr. Spruill. Put nothing together on him until Mr. Spruill said... Yeah, they list him as a poor example in their brief. They say, after what I read to you, they say, for example, unable to depose him despite having known of him since 2006. Yeah. Right. And what they're referring to there, apparently, we learned during his deposition that at a time after retiring from the Health and Human Services Department at the State of Texas, he had become a consultant with Anderson Consultants. During that period of time, in 2006, apparently, though my people had no recollection of this when I presented it to them, TransUnion had contacted Anderson Consultants and said, do you have anybody that could give us some advice on how to market this particular product? At the time, the patent had not issued on it, but TransUnion was working with the product. And they sent Kirby Spruill out, who spent some time talking about how to market it. Neither Anderson nor Kirby Spruill were hired on any kind of long-term basis. TransUnion apparently didn't feel like the information he gave them was worthwhile. They did pay him, though. I take your point. They paid for his visit. Yes, they paid for his visit. And, you know, there was no... from Mr. Spruill that he said, hey, I did this same thing at the State of Texas or anything like that. All right? So, for them to say we failed to disclose Mr. Spruill, we didn't even remember Mr. Spruill. Mr. Spruill himself doesn't in any way implicate our failure to disclose him. I'm going to ask... Go ahead. I'm going to ask who... So you can address that on your response. Sure, that would be fine. So tell us why the district court here erred in granting a stay. Why the district court what? I'm sorry. Made a mistake in granting a stay. Yeah. Well, you know, the first point I would make is that if this process of PTAB resolution is to be a cheaper, faster alternative to district court proceedings, then we were way past the point when it could achieve that goal. Judge didn't seem to think so. The judge? Well, let's compare that. Well, particularly in terms of the burden on the court. I mean, we haven't yet decided what the standard of review here is. But certainly, at least with respect to the district court's judgment about whether granting a stay would relieve a burden on the court, don't we at least on that issue have to defer to the district court's judgment and the district court being in a much better position to make that judgment than we are? Well, first of all, if the court is to affirm this stay, then the question arises of... No, but what's the answer to my question? Well... Don't we have... It will always... In the district court's judgment that this would reduce the burden on the court to grant a stay, don't we at least on that issue have to give considerable deference to the district court's judgment about that? Well, I think you give... I think you're going to give deference to the court in every case. You're certainly going to consider what the court used in its rationale. But it seems like the legislative history on this AIA statute makes it clear that this court is charged with seeing that there is a uniform consistency. Yeah, but what's the answer on this point? Yes, well, I think I've answered it. There should be deference. Yes, there should be deference. That doesn't prevent a de novo review, though, and I don't want to be confused. But that's inconsistent. I mean, you can't have both deference and de novo review. If by deference you mean judge it only by abuse of discretion standards, you know, what has existed in our history for a long time in terms of how the review stays, then I say no, you're not... You should not limit yourself. If you think about it, Your Honor, any time the court moves a case to an administrative proceeding, there's going to be a reduction in the burden on the court. I mean, that goes without saying. But the court is... The district court is familiar with the entire docket of the court, the likelihood that things will move forward, and the judgment that the status of the docket is such, the status of this case is such, that it will be a saving if the stay is granted. We have to. Don't we grant some deference on that question? I mean, how can we make the judgment about the overall docket of the court? Well, I think you can look at what the situation was at the point at which the court granted the stay and determine whether or not, number one, that reduced the burden to the court, but number two, the burden to the parties as well. And where we were at that point was three days away from the Markman hearing, which would have simplified issues. And within six months, because we were only six months away from the trial ready date, we were going to go through summary judgment motions and have resolution there. Now, if the court was obviously biased against our patent, I mean, based on what, I don't know. Biased against your patent? Yes, I think, well, he had prejudged whether this patent was valid. There's nothing wrong with the judge expressing views about the validity of the patent. It may not be pertinent to the stay, but I don't think it's fair to call that a question of bias. Well, all right. If the court were biased. I think he had an inclination to believe that our patent was invalid. Well, aren't you better off with having this before the PTO? Well, perhaps. You make that point. What we thought was that when the time came that we would be able to demonstrate to the court that this patent was not as simple as he believed, as his initial impression of it was. So we were sort of waiting patiently for that opportunity. In the meantime, the case was stayed and transferred. But let's look at simplification of issues. The number one factor to be considered. Three days away from Markman, within a six-month period after Markman, the parties were going to file motions for summary judgment. By August, which is the trial ready date, this is all happening in February. The stay is granted in February. By August, we are trial ready. So that means Markman and summary judgment is completed and resolved by that point. Now, the court may have determined in summary judgment hearings that our patent was invalid and we wouldn't go to trial. But there was a fair amount of work still to be done before trial, right? The question is, is it any more or less than the PTAB hearing? Isn't that uniquely within the district court's province? Making that balancing judgment. You made a statement earlier that you said, well, it always reduces the burden on the district court if it goes to an administrative proceeding, but that's not necessarily true. The court looks at, well, what do I have to do if I get it back? And what's the posture? What's the overall posture? And it's a pretty complicated formula they have to work. And how can we review that? It seems to me very discretionary. Well, I think it is my impression that the district court was influenced by its stated belief that this patent was invalid and therefore it wasn't coming back from PTAB. Judge Dyke, can I ask Mr. Bougrow a question? Please do. Mr. Bougrow, first of all, the trial judge had some reason to think there was a question about the validity of your patents, didn't it? Because the PTAB had already taken its first step before this issue of stay came up. Am I not correct about that? You're correct, Judge Plager. All right. Let me move to what my real question to you is. And that is the colloquy you've been having with my colleagues and, indeed, your brief seems to focus on the standard of review as being a significant issue for your winning this case on appeal. So, for example, in your brief, page 21, you start out saying, under de novo review, this court should reverse the district court, et cetera, et cetera. Let's talk a little bit about what you understand de novo review means. First of all, Mr. Bougrow, this court never does anything de novo, as it literally can be understood to mean from the beginning, all new. Everything we do is derivative of some trial forum that has already made a number of factual decisions, a number of legal decisions, and a number of judgment decisions. So the real question on the review standard is not de novo versus something else, but what do we give deference to, and how much deference are we supposed to give? For example, in this case, there are a number of factual issues, factual issues such as have the parties filed or briefed any summary judgment motions? The court said no. Has there been a Markman hearing? The court said no. These are all factual issues. You're not suggesting that we should go into the record and bring in witnesses to determine whether those facts are correct? No, not at all, Judge Blager. And you're not suggesting that the court did not understand what the statute said. You're challenging only the court's exercise of its judgment in balancing the four factors. Is that correct? No, I would take it a little further than that, Judge Blager. I would say that I believe that the district court was unfairly, unfairly to us, influenced by his belief that this, our patent or patents actually too, would be declared invalid. And I think where a de novo review would apply is looking at the record of this case and trying to find any instance where the court had the opportunity to address the validity or not of these patents. I don't see in the record, or certainly in the court's opinion, any judgment on the court's part as to the validity question at this point. I think the court reported, in effect, that the court saw the decision of the PTAB, which at least is a fact issue. And you're not, let me understand exactly what you're saying. Are you asking us to disqualify the trial judge on the basis of some improper bias or ex parte information that he brought to the case? No, not at all. What I'm saying is that I think he was influenced by his internal belief. When we had had no opportunity up to the point when this motion for stay was made, no opportunity to give him evidence of this patent and how it worked and why it was valid. You're asking for us to review the judge's final decision on the validity of your patent, but that isn't the issue in this case at all. I don't understand the judge to have made any final decision on your patent. I understand the judge simply to have said, I'm withholding my hand until the PTO can go through its statutory process. Is that right? No, I think the judge assessed the four factors that all of the courts are supposed to look at and consider in making this decision. I think he assessed those factors based upon his belief, his leaning, his inclination, that our patents were invalid when there was no basis for that conclusion on his part. I think his order is pretty clear. He refers to us as casting about for a cause of action, a theory of the case. You can look at our original complaint filed in the Eastern District of Texas. We make the same claims and theories of the case in the original complaint as we do in the last one. There was no casting about for a theory of the case, and you cannot assess. This is all irrelevant anyway in the sense that virtual agility, our decision in virtual agility says that the district court's consideration of the merits don't weigh one way or the other in terms of the state. That's not an appropriate consideration. So whatever he said about patent validity doesn't enter into the calculus except to the extent that it may have improperly influenced the decision to grant the stay. I don't disagree with that, and I would say if this court would review the four factors without any consideration of whether or not this patent was valid or invalid, it would find that it weighs in our favor, not in the movement's favor, and that this stay should not have been granted. That's where we believe the district court erred. Whatever methodology is required for this court to review that, whether that's abuse or de novo or some combination thereof, should be taken up and look at those four factors and decide whether or not the precedent that this case should set in this district, in this circuit, should be that a case four years old, finished with a discovery, six months from trial ready, three days away from markment, and at best months away from summary judgment hearings, should become the precedent in this circuit for when a stay should be granted. Okay, well, unless Judge Plager has any other questions now, why don't we hear from Mr. Feldman, and we'll give you two minutes for rebuttal in the circuit room. Good morning, Your Honors. The police and court, in regards to the way this case has been litigated. Could you tell us at the outset what the status of the PDO proceeding is now? Yes, Your Honor. The trial is complete. It was completed over a month ago. We're expecting the final order in under 60 days. How do you know? What's your basis for expecting an order within 60 days? Well, the PTAB final order is ordinarily to be issued within one year of instituting review, and that was February 5th, 2014, as I recall. So you're expecting a decision by February 2015? That's correct, Your Honor. Okay. Throughout this case, there's been a theme of mums the word, and to Judge Wallach's point as to not disclosing key witnesses, well, there's a number. But the first we would refer you to is Kathy Babcock in the Joint Appendix 330. At the close of fact discovery... What does this have to do with the stay question, the timing? Yes, it would have to do not only with timing, but with the third factor, which is essentially equitable in nature, whether or not delay would be an undue burden upon TransUnion. I'm sorry, I'm not following. Explain to me what the pertinence of this is. Yes, Your Honor. If delay is, in fact, chargeable to TransUnion, then in effect they have... Delay in asking for the stay or delay... You're talking about delay in asking for the stay or delay in instituting the covered business method proceeding? It would be delay affecting the second factor as to the stage of litigation, and the third factor as to the equities of the case. So TransUnion, for example, complained that we were approaching the beginning of the fourth year of litigation when, in fact, the district court took TransUnion to task for having amended the complaint five times, seeking a sixth, and suing a raft of parties that never should have been sued in the first place. I'm having difficulty in seeing how that's relevant here. We would agree with you, Your Honor. My learned colleague has not even addressed this court's recent decision in Versada v. Kalitas, in which the court says you should look prospectively as to the remaining work to be done on a case when you're assessing the fourth factor, as well on the second factor, the stage of litigation. But I took your argument as a basis for what was viewed by your opponent as the delay in filing the CBM petitions, and your response seemed to be, hey, there's a lot of stuff you never told us about. You gave one example, and I was seeking others. Yes, Your Honor. So there were three examples. Two events happened. First, we responded. One was your first person was named Kathy. I'll just stay focused on the effect on the filing of the petitions, if you were, as opposed to the broader question of not disclosing witnesses. I do want you to identify them for me in the record. Yes, Your Honor. So specifically, in terms of the petition, Kirby Spruill was someone that we had to find on our own. Right. And when we deposed him on May 13th of 2013, he gave bombshell testimony. He told us that he had conceived of this system in 1982, was given a million dollars by the state of Texas to develop it, had reduced it to practice with a semi-automated method in 1986, fully automated by 1998. By January 2000, there was a 1,545-page document, which we obtained from Texas under the Open Records Act, in which this system was going to be upgraded to a billion-dollar system. Then in 2005, he said he wasn't sure of the exact date, but in 2005, when he was now in the private sector, he consulted through Accenture for TransUnion and spent days with their lead inventor, Byron Baldwin, teaching them how they implemented the system in Texas. In 2006, TransUnion amended their pending claims, and the patent issued in 2008. Had we known of the importance of Mr. Spruill, we would have gone right to him. We found him on our own. He was referenced in a deposition in August of 2012, but we didn't have any idea how important he was. What is the point here, that you didn't know about the grounds for instituting the CBM proceeding until you got discovery? Is that the point? The point is, Your Honor, that in order to believe that we could file successfully— and that's one of the grounds that said to argue against a stay here. So are you addressing that by saying we didn't have the evidence to institute the PTO proceeding until we got discovery? What is the point here? Yes, Your Honor. So the procedure becomes available September 16, 2012. We didn't find our second primary reference and depose a key witness until the fall after that date. I think it was October or November of 2012. James Sooner of Long Island— And was this someone not identified to you? That's correct. And he testified that as of February 1, 1998, they were using TransUnion. The TransUnion came in and installed computers. So TransUnion's position is we've been selling him credit reports. We didn't have any idea what they were for. The same thing with Bobby Keith Graves. They were buying—Bobby Keith Graves was a principal at Dallas Computer Systems. Part of the Texas system said that TransUnion listed the credit reports as chargeable to TDHS. So we have a whole series of witnesses that are not disclosed that we have to find on our own. And until we get those and understand how this system works and can explain it to the PTAB, it's an entire reasonable that we should not be expected to file these two 80-page petitions. Counsel, if we should hold that the standard of review is de novo, you lose. Is that right? No, Your Honor. We would win under either standard because the only two cases that are in play here are the virtual agility and the Versada case, and they both heavily favor us. On the first issue, the simplification of issues, the PTAB did not just institute review on certain claims as TransUnion states, but on all claims, all 34 claims, on multiple alternative grounds. Sixteen of the 18 claims, four alternative grounds. Two for the remaining two. And then on the 408, at least two alternative grounds. Now, this court just stated that when all the litigated claims have had review instituted, that the first factor of simplification weighs more heavily in the balancing. It's a fact issue that's different, isn't it? The less my memory tells, I think both the Versada case and the virtual agility case were both cases involving denial of estate, whereas this case involves grant of estate. Doesn't that change the grant rules? I don't see why it would, as the court has clearly laid out instructions for how to apply each of the four factors. You are correct. Those were reversing denials of estate. But the virtual agility court said that we find it significant that the PTAB grant review on all asserted claims of the sole asserted patent and it determined that all of these claims were more likely than not unpatentable on two separate alternative grounds. This CBM review could dispose of the entire litigation, the ultimate simplification of factors. That applies in our case. Mr. Feldman, I want to bring you back for a moment to the delay question, which seems to me one of the main arguments here as to why the district court heard. And there is this problematic situation where people use the discovery in the district court proceeding as a way to develop information to institute the CBM proceeding. And maybe to some extent that happened here. And they delay the institution of the CBM proceeding until they have the discovery. The result of that is that the district court has expended resources essentially in aid of the CBM proceeding. That seems to me to be somewhat problematic. No, Your Honor, not if the other party is hiding witnesses. And you cannot get the information until you've gone through the discovery. And then once you have the information, you realize, aha, there's enough here to file a petition. Well, it's not just witnesses. Didn't you say that you discovered a new reference? The documents involving the Sunior Hospital, excuse me, Long Island Memorial Hospital, getting that testimony, getting that authenticated. The other major factor is that the trial court informed us on April 13th of 2013 that it was going to delay Markman by 10 months. Those were the two triggers for deciding to go forward with the CBM petitions. So you see now that it's not problematic at all to use the district court proceeding to get the discovery that lets you institute the CBM proceeding. Well, not unless, even in that situation where one assumes bad men's read, the court would have to set aside its recent authority of two weeks ago in Versada v. Colitis where the court says, look prospectively to what is left. Look prospectively. So the trial court is looking at this and says, no Markman yet, no summary judgment, no summary judgment rulings, no dauber, no motions in limine, no trial, no post-trial motions. Look at all that I am going to be saving. Do you think that delay in instituting the proceeding is not a relevant consideration? The statutory factors as framed... What's the answer? Is delay in instituting CBM a relevant consideration in whether a stay should be granted? If delay were purposeful for a bad reason, but here we have... I would just say unreasonable. Unreasonable. Yes, Your Honor. Would you buy that? If the delay was unreasonable, it would be a factor. I would, but there are several equitable maxims to show that the delay was entirely reasonable. Equity will not do a useless act. You see all these alternative grounds. The doctrine of unclean hands. You can't hide witnesses and then say, oh gee whiz, there was delay before they dug those witnesses out and got their testimony. You have the additional equitable factor that there's no irreparable harm. In virtual agility, it was a small company, a concern that they would be attrited out. Here, TransUnion is a billion-dollar company, co-owned by Goldman Sachs, which is a matter of public record, is backed by Warren Buffett and the U.S. Treasury and a member of the Federal Reserve. And both they and TransUnion are unlikely to be running out of dollars. How do you have poisoning wells and that kind of stuff? Well, Your Honor, there's been repeated discovery abuse here. They sued a hospital in Texas. What does that have to do with anything? You're just trying to prejudice us, aren't you? No, Your Honor. What does that have to do with it? Respectfully not, Your Honor. My opponent focuses retrospectively. They say, well, look at the fact discovery is complete. Look at how much we've done. So we're addressing what had to be done and why. If you are repeatedly, if they drew a Rule 11 warning from the court, which caused a party to be dismissed. I don't see that it has anything to do with this. Well, Your Honor, you would be correct under Versada v. Colitis. The view should be prospective as to what remains. I don't think Versada said the delay in instituting the CBM proceeding is irrelevant. No, it would be whether there's undue prejudice to TransUnion. Our only point is there isn't undue prejudice to them. I mean, Judge Schultz in the Joint Appendix, page 22, spent a paragraph taking TransUnion to task for all of the delay that they have brought to this case. They say, but he said, but TransUnion is hardly in a position to complain of delay. And then he follows the last sentence, TransUnion's complaints about delay and prejudice ring hollow. So the trial court, which is in the best position to observe the behavior of the parties and what is going on, commented as to why there was delay and a lack of undue prejudice. Okay. Anything else? Judge Plager, any more questions? No, sir. Thank you. Okay. Thank you, Mr. Feldman. Thank you, Judge. Mr. Boudreau, you have two minutes here. I don't know if this is of concern to the court or not. I'm happy to address this claim that we hid witnesses or failed to disclose witnesses if the court wishes to hear more on that. And I would say in the briefest way possible that Search America, you'll find nothing in the record with Search America going to the district court saying TransUnion is hiding out witnesses or failing to disclose witnesses. Why did the judge say you were skating close to Rule 11? What did he say regarding Rule 11? Why did the judge, your opponent says, and I recall seeing it in there too, that you were skating close to Rule 11. Why was that? That was at an early hearing, 12B6 hearing, yes. By the time that process was finished, we had pled satisfactorily to the court. And that's all I have to say about that. I mean, he felt like our pleadings were light in respect to Quambly and so on. And he told us that, and he told us where he thought it was deficient. And we told him whether we thought we could make that pleading in good faith. And then did. And he finishes by saying to Search America, actually, I think I've made TransUnion plead more than required by our rules or forms. And that's the way that series ends. There was never a time until we got to this court, or the briefing in this court, that I heard anything about failing to disclose Kirby Spruill, as though we knew of him and knew of what he was doing at the State of Texas. Kathy Babcock, we actually had a hearing on that because we did disclose her, and they wanted her taken off the list. You represented to us, in your primary argument, that Mr. Spruill was solely a consultant about marketing. And yet, your opponent says he met extensively with the inventor and discussed primary information. So what is it? What's in the record? What I know about the record with Mr. Spruill in that visit to TransUnion was that his superiors at Anderson Consultants said, Kirby, go to TransUnion. They want to talk to you about marketing in the healthcare industry. He arrived in Chicago midday at the TransUnion offices, left sometime the next day, and was never heard from again. That's not to say he didn't provide some sort of valuable information to us, but he wasn't there to discuss what he had done at the State of Texas. We didn't have any awareness that he had done anything at the State of Texas. That's the sum and substance of Mr. Spruill's testimony, as I recall it. I'm going to go back and look. Yeah, that's fine. Anything else? One final thought? Only to say this, Your Honor, that the Mather prior art that they referenced, this is before they get to the State of Texas and Kirby Spruill, they knew about in 2011. In fact, they have quite an exposé at the Joint Appendix, pages 544 through 573. That's one of the claims pending at PTAP right now, to suggest that they needed to get all of this information in the sworn testimony form from Kirby Spruill in order to go forward with their CBM is simply contrary to the record. Thank you, Mr. Boudreaux, and thank you both, counsel. The case is submitted. We'll take a recess for ten minutes or so.